## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| EMMA ROEDEL, | |
| PLAINTIFF, | Case No.: |
| v. | |
| MICHIGAN STATE UNIVERSITY, THE MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES, and individual defendants LOU ANNA SIMON, MARK HOLLIS, YOLANDA JOHNSON, and JESSICA NORRIS, individually and in their official capacities, | Hon. |
| DEFENDANTS. | |

Karen Truszkowski (P56929)
*Temperance Legal Group PLLC*
Attorney for Plaintiff
503 Mall Court #131
Lansing, MI 48912
844-534-2560 phone
800-531-6527 fax
karen@temperancelegalgroup.com

## COMPLAINT AND JURY DEMAND

Plaintiff, EMMA ROEDEL, by and through her attorney, KAREN TRUSZKOWSKI, hereby files the following Complaint against Defendants as captioned above.

### JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

1

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the events

        giving rise to this claim occurred in this judicial district, and because Plaintiff and

        Defendants are both located in this judicial district.

## THE PARTIES

3.      Plaintiff was, at all material times, a student at Michigan State University.

4.      Michigan State University (hereinafter "MSU") is a public university receiving

        federal funds.

5.      MSU is governed by Defendant the Michigan State University Board of Trustees

        (hereinafter "the Board").

6.      At all material times, Defendant Lou Anna Simon (hereinafter "Simon"), in her

        official capacity, was an agent and/or employee of MSU, acting or failing to act

        within the scope, course, and authority of her employment and her employer.

7.      At all material times, Simon was the President of MSU.

8.      At all material times, Defendant Mark Hollis (hereinafter "Hollis"), in his official

        capacity, was an agent and/or employee of MSU, acting or failing to act within the

        scope, course, and authority of his employment and his employer.

9.      From January 1, 2008 to January 31, 2018 Hollis was the Director of Athletics at

        MSU.

10.     At all material times, Defendant Yolanda Johnson (hereinafter "Johnson"), in her

        official capacity, was an agent and/or employee of MSU, acting or failing to act

        within the scope, course, and authority of her employment and her employer.

11.     At all material times, Johnson was an assistant coach on the MSU women's and

        men's track teams.

2

12.　　At all material times, Defendant Jessica Norris (hereinafter "Norris"), in her official capacity, was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of her employment and her employer.

13.　　At all material times, Norris was MSU's Title IX Coordinator, responsible for oversight and training of all Title IX response and programming for the university.

### APPLICABLE LAW AND POLICY

14.　　MSU receives federal financial assistance and is subject to the dictates of Title IX.

15.　　Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

16.　　Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.  34 C.F.R § 106.8(b) provides:

> . . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

17.　　In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

18.　　While a school in itself may not be committing the sexual harassment, it can be said to be intentionally discriminating if it knows of severe and pervasive sexual

harassment occurring within its control, for example, and does nothing. *Gebser*, 524 U.S. at 290.

19. In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

20. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

> deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

> the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

> *Davis*, 526 U.S. at 1669-76.

## COMMON ALLEGATIONS REGARDING PLAINTIFF

21. Plaintiff Roedel was recruited from her high school to be a member of the MSU women's track team.

22. Plaintiff started as a freshman walk-on athlete in fall 2016.

23. Plaintiff was a sprinter and not a long-distance runner.

24. Plaintiff was a star athlete in high school and was the first woman athlete on the track team to run as a freshman in competition.

25. Most of the members of the men and women's track teams were housed in the same dormitory on the MSU campus.

26.     On or around March 5th, 2017, at approximately 2:00 a.m., Plaintiff was asleep in her dorm room when she woke up to John Doe sexually assaulting her.[1]

27.     John Doe was a highly regarded track athlete in his high school and at the time of the assault was a freshman and fellow athlete on the MSU men's track team.

28.     Plaintiff attempted to forcibly push John Doe off her but was unable to do so.

29.     The next morning, Plaintiff Roedel learned from a friend that John Doe had taken a photo of her naked except for a bra and distributed the photo via Snapchat to the entire men and women's track team. The friend showed the photo to Plaintiff.

30.     Plaintiff sent John Doe a text message asking him if he remembered what had happened. He indicated that he did remember and acknowledged that he sexually assaulted Plaintiff while she was asleep, stating "I apologize for everything," and "no excuse either way on my part."  EXHIBIT A.

31.     On Monday, March 7, 2017, the first Monday after the incident, Plaintiff reported what had happened to her MSU track coach, Defendant Johnson.

32.     Johnson was a coach for both the men's and women's track teams.

33.     Johnson told Plaintiff that if she pursued any claims against John Doe, no one would like her, and that because Plaintiff is pretty, she would become a distraction.

34.     Johnson was a responsible employee under MSU's mandatory reporting policy, so she notified the police of Plaintiff's report of the sexual assault.

35.     The police took a report from Plaintiff regarding the incident.

36.     Shortly after Plaintiff made a report to the police, a group of members of the men's track team confronted Plaintiff in her dorm room.

---

[1] John Doe is a pseudonym to protect his identity.

37. The members of the men's track team who came to Plaintiff's dorm room threatened if she pursued any charges against John Doe, she would suffer adverse consequences.

38. Plaintiff declined to press criminal charges against John Doe in order to protect herself from retaliation and harm from the men's track team members.

39. The Office of Institutional Equity, MSU's Title IX office, contacted Plaintiff, and Plaintiff also declined to pursue a Title IX investigation because of the state of extreme fear she was in after the threats she received from the men's track team members.

40. During finals week of the spring 2017 semester, Johnson met with Plaintiff to discuss plans for the following year.[2]

41. Johnson indicated that because the men's and women's teams practiced together, some modifications would have to be made because Plaintiff could not practice in the same place as John Doe.

42. During that meeting, Johnson indicated to Plaintiff that Plaintiff would no longer compete as a sprinter, and she would instead have to run distance events.

43. Johnson also indicated that Plaintiff had the choice of either of running distance events, quit the team altogether, or transfer to another school.

44. Johnson indicated that she would "release" the Plaintiff to transfer to another school.

45. The entire coaching staff was aware that Plaintiff is a sprinter, and that she never had any interest in running distance events.  Plaintiff's strength and talent was as a sprinter.

---

[2] Finals week during spring 2017 was Monday, May 5/1/2017 – Friday, 5/5/2017.

46.     Johnson also indicated to Plaintiff that there would be no further investigation into John Doe, and that he would be permitted to stay on the team. It was Plaintiff who was made to leave the team.

47.     MSU's response to Plaintiff clearly indicated that the institution valued John Doe's status as a male athlete over remedying the harm John Doe had caused to her, and further, valued John doe as an athlete over Plaintiff.

48.     Plaintiff, having no other choice, transferred to Grand Valley State University ("GVSU") so that she could continue to pursue her love of sprinting on the track team there.[3]

49.     Eventually, Plaintiff quit the track team at GVSU as she found that her love of running had disappeared after what she experienced at MSU.

50.     MSU never provided Plaintiff with any explanation of her rights under Title IX.

51.     Those rights included a right to file a Title IX complaint and initiate a formal investigation into John Doe's sexual assault of her, her right to be safe from retaliation, her right to interim measures or accommodations to assist her with ensuring that her academics and mental health did not suffer as a result of the rape.

52.     MSU did not explain to Plaintiff that was entitled to interim measures or accommodations such as counseling, academic assistance, even if she chose not to initiate a formal Title IX investigation.

53.     Upon information and belief, John Doe later sexually assaulted another individual and he was removed from the men's track team.

_____

[3] Track is a "club" at Grand Valley.

54.     Plaintiff has suffered severe emotional and physical illness as a result of the incident and the aftermath, including Post-Traumatic Stress Disorder and ongoing sleep disturbances that have affected her functioning in many serious ways.

## ALLEGATIONS REGARDING TREATMENT OF ATHLETES
## AND SEXUAL ASSAULT

55.     On information and belief, MSU has fostered a culture in which female victims are discouraged from reporting sexual assaults when those assaults are perpetrated by male athletes, thus protecting the university, the male athletics programs, and the male athletes at the expense of the female victims.

56.     The repeated comments made by Defendant Johnson suggest that female students are discouraged from reporting sexual assault when the alleged perpetrators are well-known athletes.

57.     Discouraging female students from reporting sexual assaults committed by student athletes plausibly creates an environment where male athletes can sexually assault women without repercussion.

58.     This environment creates a heightened risk of sexual assault for women.

59.     MSU has been under scrutiny regarding its handling of sexual assault cases, especially as they relate to MSU athletics.

60.     MSU has been investigated by the Michigan Attorney General, the NCAA, the Michigan Legislature, United States Congress, and the U.S. Department of Education Office for Civil Rights and Federal Student Aid Division.

61.     MSU has not been transparent when dealing with various investigators, agencies, and media regarding sexual assault incidents and/or allegations.

62.    MSU actively sought to conceal the names of MSU athletes named in campus police records.[4]

63.    MSU routinely allowed its Athletic Director, Defendant Hollis, and other athletic department personnel to investigate Title IX complaints involving MSU athletes.[5]

64.    According to a former MSU sexual assault counselor, if an athlete was involved, normal protocol and policy were "swept away" and the complaint was handled by administration and athletic officials "behind closed doors."[6]

65.    MSU created and fostered an unwritten, official policy of treating sexual assault complaints perpetrated by MSU male athletes differently than they treated nonathlete related sexual assault complaints.

66.    MSU's unwritten policy was designed to suppress public knowledge and prevent prosecution and accountability of male MSU athletes to the detriment of female sexual assault victims.

67.    Said policy emboldened male athletes and has given them unwritten permission to commit acts of sexual assault without consequence.

68.    During a U.S. Department of Education, Office for Civil Rights investigation, MSU students stated that the "University's athletes have a reputation for engaging in sexual harassment and sexual assault and not being punished for it, because athletes are held in such high regard at the University."[7]

---

[4] See ESPN, OTL: Michigan State secrets extend far beyond Larry Nassar Case.
[5] *Id.*
[6] *Id.,* ESPN quoting Lauren Allswede, an MSU sexual assault counselor from 2008-2015.
[7] U.S. Department of Education, Office of Civil Rights letter dated September 1, 2015 to Kristine Zayko, Deputy General Counsel, Michigan State University.

69.     MSU created an atmosphere and culture in which female victims became vulnerable to predatory male athletes.

70.     Upon information and belief, male athletes accused of sexual assault are treated differently than the general student population.

71.     Upon information and belief, female athletes that are victims of sexual assault are also treated differently than non-athlete students.

72.     Sexual assault involving athletes is routinely handled by the athletic department instead of through the university's standard protocols.

## PREFERENTIAL TREATMENT OF MALE ATHLETES

### STUDENT HELEN[8]

73.     On November 20, 2009, Student Helen ("Helen") was sexually assaulted by two MSU athletes, one a prominent football player, Tom Roe 1 and Tom Roe 2.[9]  Student Helen did not report the assault until January 17, 2010, when she was arrested for a separate Minor in Possession of Alcohol charge.  While Helen was in the jail holding cell, she stated that she was suicidal at which point she was taken to Sparrow Hospital.  Sparrow personnel called the MSU police.

74.     Helen told the MSU police she had been raped in November 2009, but she did not want to make a report because she did not want to get anyone in trouble.  She asked to make a report without disclosing the names of her assailants.  The MSU police took her report.

---

[8] Student Helen is a pseudonym.
[9] The players are not identified by name as they were not charged or disciplined.

75.    On January 26, 2010, Helen met with the MSU Police again to give a supplemental statement. During that interview, Helen described in detail what had happened to her on the night of November 20, 2009.

76.    Helen told the police that the two players had attempted to force her to perform oral sex on them which she refused to do.  One of the players attempted vaginal intercourse but he was unable to maintain an erection.  That player eventually drove Helen back to her residence.  In the police report the player stated that he did not see anything wrong with what happened because they "were all drunk."

77.    Upon information and belief, this incident was not reported to the Title IX office, nor was Helen advised of her option to report to the Title IX office.

78.    Upon information and belief, the assailants were never criminally charged.

79.    Helen was charged with Minor in Possession of Alcohol.

80.    Helen was never advised of her rights to a Title IX investigation, nor was she advised of her rights to interim measures, academic accommodations, or counseling.

81.    At the time, MSU Police standard protocol for handling sexual assault cases was for the police officer to notify the victim that the officer would file a complaint with the student judicial system if the victim did not wish to file on their own behalf.

**STUDENT DONNA**

82.    In 2010, MSU Student Donna, ("Donna") was sexually assaulted by three MSU basketball players, Tom Roe 3, Tom Roe 4, and Tom Roe 5.[10]

83.    Donna did not want to report the assaults to police for fear of retaliation.  Therefore, she kept the information to herself.

84.    Donna was an employee of Greenline, the MSU student fundraising office.

---

[10] Student Donna is a pseudonym.

85.  While at work at Greenline, Donna overheard another Greenline employee mention that she too had been sexually assaulted by basketball players.[11]

86.  When Donna learned that MSU basketball players had assaulted another female student, Donna decided that she needed to report her assault to the athletic department to prevent it from happening to someone else.

87.  Donna's parents approached then Athletic Director Defendant Hollis for assistance and guidance as to how to protect Donna and other students.[12]

88.  Hollis appeared concerned and upset when he learned what had happened to Donna.

89.  Hollis told Donna's parents that he would speak with the coaches and the players, giving the impression that Hollis would act on the information. Hollis assured Donna's parents that Donna would be protected.

90.  Upon information and belief, Hollis never reported the incident to the police, or the Title IX office, contrary to his duty to make a report as a responsible employee under university policy.  Instead, Hollis spoke to the coaches and players privately.

91.  Donna's parents went to see Hollis for a second meeting at which time they were told by Hollis that nothing could be done about the assault.

92.  Upon information and belief, Associate Athletic Director Alan Haller ("Haller") was present for one or both meetings.   Haller also did not report the incident.

93.  The three basketball players were never disciplined, and no criminal charges were ever brought against them.

---

[11] The players are not identified by name as they were not charged or disciplined.
[12] Hollis resigned as Athletic Director in January 2018.

94.     Donna sought help on her own from the Sexual Assault Program ("SAP") as she was friends with a SAP Student Advocate who directed Donna to the SAP office.

95.     Upon information and belief, no Title IX investigation was conducted regarding Student Donna's sexual assault.

### STUDENT BRENDA

96.     On or about August 28, 2010, Student Brenda ("Brenda") was sexually assaulted by two freshman basketball players Tom Roe 6 and Tom Roe 7.[13]

97.     Brenda and the two players all lived in Wonders Hall dormitory on campus.   The assault took place in the players' dorm room.

98.     It was MSU policy that all freshman must live on campus, except for certain students that commuted to campus.

99.     The players reportedly cornered Brenda in their dorm, removed her underwear, took her to the ground, and penetrated her orally, vaginally, and anally.  Brenda repeatedly told them to stop.

100.    One of the players later admitted that he could "understand how she [Brenda] would feel that she was not free to leave."

101.    After the assault was reported to police, the two players were immediately removed from Wonders Hall and moved to Spartan Village.

102.    Although representations were made to Brenda that Wonders Hall Complex Director Paul Rinella orchestrated the removal of the two players from the dorm to Spartan Village, it was the President's office and the General Counsel's office that handled the move.

---

[13] The players are not identified by name as they were not charged or disciplined.

103.   This move circumvented the usual student judicial system and Residence Life Process for removal of students from university housing.   The President's office and General Counsel's office typically would not be involved in the removal of students from a dorm.

104.   In an MSU employee-to-employee email dated September 2, 20210, reference is made to the perpetrators as "high profile student athletes.  The Office of the President is involved."

105.   Further mention is made of the athletic department's involvement in an email dated September 4, 2010, which states, "It is possible that these two male residents, along with the basketball office, might be willing to make their 'temporary' housing assignment a permanent one."

106.   On or about September 27, 2010, the Ingham County Prosecutor declined to press charges against the athletes, despite the MSU police recommendation that charges be filed.

107.   At no time was Brenda contacted by the Title IX office until MSU was instructed by the U.S. Department of Education's Office for Civil Rights to conduct a Title IX investigation into Brenda's case.

108.   Brenda initially met with MSU's Title IX Coordinator, Paulette Granberry-Russell.   In that initial meeting Granberry-Russell asked Brenda "why didn't you run away?"

109.   Brenda was also prevented from having an advocate with her during the initial meeting with Granberry-Russell.   It was shortly after that meeting that Brenda became suicidal.

110.   Brenda never received a copy of any Title IX report, she was never informed of the status of the players and where they were living, and she was never advised of her Title IX rights to interim measures, academic accommodations, and counseling.

111.   In her response to the U.S. Department of Education's Office for Civil Rights inquiry dated August 22, 2011, MSU Deputy General Counsel Kristine Zayko[14] incorrectly states that the Wonders Hall Complex Director Paul Rinella removed the two players from their dorm.

112.   This representation contradicts the directive by the President's office to move the two players.  In fact, Wonders Hall Complex Director Paul Rinella was at the hospital on a completely unrelated matter when the players were moved, and he had no knowledge of the move until much later.

### UNKNOWN STUDENT LILY

113.   In 2011, after the incident with Brenda, Lauren Allswede was asked by Deputy General Counsel Kristine Zayko if it would matter to Allswede that MSU football head coach Mark Dantonio had "kicked a football player off the team" after talking to the player's mother.

114.   Although Allswede did not know the identity of the alleged victim or the athlete, Zayko gave her the impression that the football player had been disciplined internally by Coach Dantonio and the athletics department, and the incident had not been reported to police or the university.

115.   Upon information and belief, after the football player Zayko was referring to was accused of sexual assault, Coach Dantonio advised him to talk to his mother about

---

[14] In May 2018, Kristine Zayko resigned from MSU.

what had happened.  This violated MSU's Title IX policy for handling incidents involving sexual assault.

116.   This contradicted Coach Dantonio's representation at a press conference held on June 6, 2017, at which Coach Dantonio stated that "this [sexual assault] is new ground for us, it's not happened previously."[15]  This was a reference to the sexual assault of a female student by three MSU football players who were removed from the football team and later convicted.

### FORMER STUDENT AMANDA THOMASHOW[16]

117.   In 2014, Amanda Thomashow reported to MSU police that former MSU doctor Larry Nassar had sexually assaulted her during a medical appointment in his university office.

118.   This report prompted a police investigation and a Title IX investigation.

119.   Prosecutors declined to charge Nassar at that time.

120.   Relying on medical opinions of MSU employees with ties to Nassar, the Title IX Investigator determined that Thomashow received an appropriate medical procedure.

121.   The Title IX Investigator also determined that Thomashow did not understand the "nuanced difference" between a medical procedure and sexual assault.

122.   The Title IX Investigator prepared two separate Title IX reports, providing Thomashow with a report that contained less information than the report prepared for Nassar and the university.

---

[15] MSU Press Conference June 6, 2017.
[16] Amanda Thomashow is her real name.

123. The extended version of the report stated that Nassar's conduct could open the university to lawsuits and expose patients to "unnecessary trauma based on the possibility of perceived inappropriate sexual misconduct."

124. Thomashow's report had a 41-word conclusion. The university and Nassar's version of the report had a 246-word conclusion.

125. Upon information and belief, this was the only Title IX report issued by the MSU Title IX office with two different versions.

126. Nassar saw patients for another 16 months after that Title IX report was issued until he was charged with possession of child pornography in December 2016.

### TRENDS NOTICED BY THE SEXUAL ASSAULT PROGRAM COUNSELORS AND DIRECTOR

127. In 2011, Student Brenda filed a Title IX complaint with the U.S. Department of Education, Office for Civil Rights ("OCR").[17]

128. On August 22, 2011, Kristine Zayko sent a written response to OCR regarding their inquiry about Student Brenda.

129. As part of her response to the OCR inquiry, Zayko asked Allswede to provide Zayko with a report regarding Student Brenda.

130. In her report, Allswede noted that there had been five basketball players accused of sexual assault in 2010, and she expressed her concerns about a possible pattern. This information from Allswede's report was not in Zayko's written response to the OCR inquiry.

---

[17] OCR Docket # 15-11-2098.

131.    In her response to a 2018 NCAA investigation, Allswede again expressed concerns that there were two separate incidents regarding five different MSU basketball players within a short period of time in 2010, indicating a potential pattern.

132.    According to Allswede, the athletic department did not participate in university committees created to prevent or respond to sexual assault on campus.

133.    According to Allswede, the MSU SAP personnel were not allowed to attend MSU Title IX Coordinate Response Team ("TCRT") meetings where sexual assault cases were discussed by the Title IX office, MSU police, MSU Residence Education staff, MSU Student Affairs and Services staff, and other relevant MSU employees.

134.    Shari Murgittroyd, previous director of SAP, supervised SAP counselors from 2005 through 2015.[18]

135.    In her role as director, Murgittroyd personally knew of three MSU female athletes who had been sexually assaulted who were advised to not seek sexual assault counseling through SAP and instead were told to stay within the athletic department.

136.    Also, in her role as director from 2005 through 2010, Murgittroyd knew of a multitude of female students that had been sexually assaulted by MSU athletes who had been discouraged from reporting their assaults to the MSU Title IX office and law enforcement.

**MURGITTROYD'S OBSERVATIONS OF THE MSU RESPONSE TO SEXUAL ASSAULT AND HARASSMENT**

137.    In her role as Director of SAP, Murgittroyd made observations about the MSU culture of minimizing or even ignoring sexual harassment.

---

[18] In addition to her time as SAP Director, Shari Murgittroyd is a trauma therapist who is qualified as an expert witness in the areas of sexual assault trauma and domestic violence.  She teaches a class at MSU entitled Power, Privilege, and Intimate Violence.

138.    Professionals at MSU who were not trained in trauma-based response discouraged victims from reporting sexual assaults.

139.    MSU staff and faculty experienced a culture of minimizing or ignoring sexual harassment.  This was related to the lack of action from administrators and Title IX investigators, and because of retaliation after reports, especially involving perpetrators with institutional privilege and power.

140.    When MSU employees, particularly SAP advocates, disclosed reports of sexual assault or harassment involving athletes as alleged perpetrators, the employees were met with discouragement and questioning as to whether the reports were "valid." SAP employees soon realized that there was tremendous institutional support for athletes and coaches and the athletic department in general at MSU.

141.    There was an undeniable culture of fear at MSU around reporting assaults committed by perpetrators of power, particularly athletes.

142.    When SAP and other victim-service agencies attempted to work with the athletic department or provide training with MSU athletes and coaches, the attempts were largely ignored.

143.    SAP victim advocates were never told what training in sexual assault and harassment coaches and athletes were supposedly receiving.  The athletic department was isolated, and it was rare that athletic department staff would meet with SAP or attend larger campus coalition meetings involving sexual assault and relationship violence.

144.    Sex offenders at MSU, particularly athletes, are not held accountable for their actions.

145.    When sex offenders are not held accountable for their actions through the MSU Title IX system or the criminal justice system, it is a message to the offenders that victims

are not heard or taken seriously and gives them the "green light" to perpetrate more sexual assaults without consequences.

146. The MSU culture allowed for serial rapists to continue to target and prey on other victims in the student body.

147. Sex offenders are serial in nature and premeditate assaults against victims who are less likely to report.

148. Most victims are raped by someone they know, and perpetrators intentionally assault within their own social circle because these victims are less likely to report.

149. Victim safety was not a priority for MSU, or students would not have been discouraged from reporting sexual assault and harassment. Instead, students would have been encouraged to report and seek advocacy and counseling services from trauma-informed experts in SAP.

150. MSU's unwritten policy of non-support of victims put students at a heightened risk of sexual assault and constitutes discrimination against female students, depriving them of their right to an educational environment free of sex-based harassment, which is required under Title IX.

151. In its final report dated September 1, 2015, which included the investigation of Student Brenda's assault, OCR determined the following: "taking into account all of the evidence gathered during the investigation, OCR determined that a sexually hostile environment existed and affected numerous students and staff on campus at the University during the time period covered by OCR's investigation; and that the University's failure to address complaints of sexual harassment, including sexual

violence in a prompt and equitable manner caused and may have contributed to a
continuation of this sexually hostile environment."[19]

152.   In furtherance of the goal of discouraging female assault victims from pursuing male
perpetrators, students are "interviewed" by MSU counseling department personnel
when victims request their own counseling and medical records.

153.   Victims are interrogated as to why they are requesting their records and told that the
Office of General Counsel will review their records before they are released to them.

154.   This action would reasonably intimidate anyone asking for a copy of their counseling
their records knowing that the request would initiate the university attorneys review
of their private medical and mental health records.

155.   Victims do not reasonably have the expectation that their confidential counseling and
medical records are subject to review and scrutiny by university attorneys.

### COUNT I
### VIOLATION OF TITLE IX
### (20 U.S.C. § 1681, *et seq*)
### (As to all Defendants)

156.   Plaintiff incorporates all previous Paragraphs of this Complaint as if fully set forth
herein.

157.   The sex-based harassment articulated in Plaintiff's general allegations was so severe,
pervasive, and objectively offensive that it deprived Plaintiff of access to educational
benefits provided by the school.

158.   Defendants created and/or subjected Plaintiff to a hostile educational environment in
violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a)
("Title IX"), because:

---

[19] OCR Docket # 15-11-2098 and #15-14-2113

a. Plaintiff, a female student, was a member of a protected class.

b. Plaintiff was subjected to sexual harassment in the form of a sexual assault by another student(s).

c. Plaintiff was subjected to harassment based on her sex.

d. Defendants created the circumstances which permitted the sexual assault to take place.

e. Defendants failed to follow normal reporting and investigative procedures when MSU athletes were involved.

f. Defendants allowed the Athletic Director and other athletic department personnel to investigate.

g. Defendants' failure to follow normal protocols in order to protect the university and its high-profile sports teams cultivated an environment in which female students became vulnerable to sexual assault.

159. Plaintiff was subjected to a hostile educational environment created by Defendants' lack of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment and/or lack of implementation of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment.

160. Defendants' failure to promptly and appropriately respond to the sexual harassment resulted in Plaintiff, on the basis of her sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in MSU's education program in violation of Title IX.

161.    Defendants failed to take immediate, effective remedial steps to resolve the complaint of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

162.    Defendants persisted in their actions and inaction even after they had actual knowledge of the harm suffered by Plaintiff.

163.    Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually assaulted from seeking assistance and protection: Defendants engaged in suppressing sexual assault grievances, violated its own policies regarding sexual assault investigations, violated Title IX, and provided preferential treatment to male athletes.

164.    This pattern and practice of behavior constitutes disparate and unequal treatment of female students and has a disparate impact on female students.

165.    This pattern and practice of behavior creates a heightened risk of assault and violence perpetrated on females.

166.    Plaintiff has suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of earnings, loss of earning capacity, and past and ongoing medical expenses as a direct and proximate result of Defendant's deliberate indifference to her rights under Title IX.

**COUNT II**
**VIOLATION OF § 1983**
**(42 U.S.C. § 1983)**
**(As to All Defendants)**

167.    Plaintiff incorporates all previous Paragraphs of this Complaint as if fully set forth herein.

168. Under the Fourteenth Amendment, Plaintiff, a female university student, had the right to Equal Protection of Laws.

169. Defendants were state actors acting under the color of state law.

170. Defendants subjected Plaintiff to violations of her right to and Equal Protection of Laws by maintaining a custom, policy and/or procedure of:

   a. Actively discouraging victims of sexual assault from reporting when the perpetrator was an MSU male athlete;

   b. Failing to notify sexual assault victims of their Title IX protections, rights and accommodations;

   c. Failing to notify sexual assault victims of all reporting and confidentiality options; and

   d. Requiring the female assault victim to accommodate the needs of the male athlete perpetrator.

171. Plaintiff has suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of earnings, loss of earning capacity, and past and ongoing medical expenses as a direct and proximate result of Defendant's deliberate indifference to her rights under Title IX.

## COUNT III
## ELCRA (GENDER/SEX DISCRIMINATION)
### As to All Defendants

172. Plaintiff incorporates all previous Paragraphs of this Complaint as if fully set forth herein.

173. Plaintiff is a member of a protected class pursuant to the Constitution of the State of Michigan and the Elliott Larsen Civil Rights Act ("ELCRA")5, MCL 37.2101 et seq. and MCL 37.2301.

174. The facilities operated by the Defendant Michigan State University were and are an educational institution under the ELCRA, MCL 37.2401 *et seq*. and MCL 37.2301.

175. Defendants' policies and practices, including a failure to properly warn, train, and/or educate its students regarding the prevention of sexual harassment and/or assault, and the failure to properly investigate reports of sexual harassment and assault have a disparate impact on Plaintiff as a female by subjecting her to increased levels of sexual abuse, assault and other violence on campus in comparison to male students and by subjecting them to increased levels of emotional distress and other harm by virtue of Defendants' failures to promptly and appropriately address complaints of sexual assault.

176. Defendants' acts and omissions based upon Plaintiff's gender have resulted in harm to Plaintiff including physical and emotional harm, and Plaintiff being denied privileges and opportunities that should be available to her in violation of MCL 37.2103 et seq.; MCL 37.2701(a)(f).

## COUNT IV
## THE UNIVERSITY BOARD OF TRUSTEES BYLAWS
## BREACH OF CONTRACTUAL DUTY
## (As to Defendants MSU and MSU Board of Trustees)

177. The Preamble to the Bylaws of Defendant Board of Trustees states: "In order to make effective the principle here declared, to achieve the state objectives of Michigan State University, and to insure that the conduct of its own affairs will be in accord with the

highest standards of educational administration, the Board of Trustees adopts these Bylaws."[20]

178. The Trustees of Michigan State University and their successors in office are created by the people of Michigan through the Constitution as a body corporate known as the Board of Trustees of Michigan University, with the power of general supervision over the institution and the control and direction of all expenditures from the institution's funds.[21]

179. Defendant Board of Trustees' Bylaws state that "[As] a land-grant university, it [MSU] shares with its sister universities the legal responsibility to provide a liberal and practical education for the agricultural and industrial classes and all others, to prepare them for the various pursuits and professions of life."[22]

180. The Bylaws further state that "It shall be the policy of the Board to provide equal educational opportunity to all qualified students from the State of Michigan and, insofar as facilities, faculty, and accommodations permit, a reasonable number from other states and other countries. The Board of Trustees is committed to the objectives of diversity and pluralism and to the principles of equal opportunity, non-discrimination, and affirmative action as reflected in various federal and state laws, orders and regulations, as well as in various University policies and regulations and will treat students and student organizations in a non-discriminatory manner in accordance with the law and its own internal policies and regulations.[23]

---

[20] Michigan State University Board of Trustees Bylaws, effective as of December 16, 1965, revised as of January 10th, 2003, Preamble.
[21] *Id.* Article 1.
[22] *Id.* Preamble.
[23] *Id.*

181. Defendants have a duty to implement and enforce the Bylaws for the benefit of the citizens of the State of Michigan and the students that choose to attend Michigan State University.

182. Failure to implement and enforce the Bylaws constitutes a breach of the contractual duty Defendants have to the citizens of the State of Michigan and the students that choose to attend Michigan State University, as well as the Plaintiff.

183. Defendants MSU and the Board of Trustees have failed to implement and enforce their own Bylaws in the following ways:

   a. Allowing known predators to abuse female athletes and other female students despite a documented history of notice of the abuse to Defendants, university administrators, and university employees;

   b. Perpetuating a culture of deliberate indifference toward sexual assault and harassment;

   c. Refusing to cooperate with law enforcement investigations of sexual assault and harassment;

   d. Publicly committing to cooperating with law enforcement investigations and subsequently refusing to cooperate;

   e. Allowing university administrators, officials, and employees to abuse students despite a documented history of notice of the abuse to Defendants; and

   f. Treating discrimination based upon gender differently than discrimination based upon race, religion, and other protected classes.

184. Plaintiff; citizens of the State of Michigan; and current, prospective, and past MSU students have suffered damages as a result of Defendants' failure to implement and enforce Defendant Board of Trustees' own Bylaws, which create a contract between

Defendants and Plaintiff; the citizens of Michigan; and all past, present, and future students of MSU.

185.    Plaintiff has suffered actual and consequential damages as a result of Defendants' breach of their contractual duty to Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor and against Defendants as follows:

a.   Compensatory damages for Plaintiff's psychological and emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, prevention of obtaining full enjoyment of life, loss of earnings past, present, and future, loss of earning capacity, past, present, and future expenses for medical and psychological treatment and therapy;

b.   Punitive damages;

c.   Statutory interest;

d.   Costs;

e.   Reasonable attorney fees;

f.   Such other relief as the court deems appropriate.

## <u>JURY DEMAND</u>

Now comes Plaintiff by and through her attorney, Karen Truszkowski, and demands a trial by jury.


DATED:   April 29, 2020

*/s/ Karen Truszkowski*
Karen Truszkowski (P56929)
*Temperance Legal Group PLLC*
Attorney for Plaintiff
503 Mall Court #131
Lansing, MI 48912
844-534-2560 phone
800-531-6527 fax
karen@temperancelegalgroup.com